**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **BAY AREA HEALTHCARE GROUP, LTD. D/B/A/ CORPUS CHRISTI MEDICAL CENTER; KPH-CONSOLIDATION, INC. D/B/A HCA HOUSTON HEALTHCARE NORTH CYPRESS; LONE PEAK HOSPITAL, INC. D/B/A LONE PEAK HOSPITAL; HTI MEMORIAL HOSPITAL CORPORATION D/B/A TRISTAR SKYLINE MEDICAL CENTER; MIDWEST DIVISION-RBH, LLC D/B/A BELTON REGIONAL MEDICAL CENTER; MH MISSION HOSPITAL, LLLP D/B/A MISSION HOSPITAL; MIDWEST DIVISION-OPRMC, LLC D/B/A OVERLAND PARK REGIONAL MEDICAL CENTER,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**BLUE CROSS BLUE SHIELD HEALTHCARE PLAN OF GEORGIA, INC. D/B/A ANTHEM BLUE CROSS AND BLUE SHIELD,**<br><br>**Defendant.** | : | **Civil Action No.** |

**COMPLAINT**

Plaintiffs, Bay Area Healthcare Group, Ltd. d/b/a/ Corpus Christi Medical Center; KPH-Consolidation, Inc. d/b/a HCA Houston Healthcare North Cypress;

Lone Peak Hospital, Inc. d/b/a Lone Peak Hospital; HTI Memorial Hospital Corporation d/b/a TriStar Skyline Medical Center; Midwest Division-RBH, LLC d/b/a Belton Regional Medical Center; MH Mission Hospital, LLLP d/b/a Mission Hospital; and Midwest Division-OPRMC, LLC d/b/a Overland Park Regional Medical Center ("Hospitals" or "Plaintiffs"), by and through their attorneys, Polsinelli PC, bring this action against Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. d/b/a Anthem Blue Cross and Blue Shield ("Anthem GA" or "Defendant"), stating as follows:

## PARTIES

1. Plaintiff Bay Area Healthcare Group, Ltd. d/b/a/ Corpus Christi Medical Center ("Corpus Christi") is a hospital operating in Texas. Bay Area Healthcare Group, Ltd. is a Texas limited partnership. Bay Area Healthcare Group, Ltd. has five partners: Columbia Hospital Corporation of Bay Area, a Texas corporation with its principal place of business in Davidson County, Tennessee; South Texas Surgicare, Inc., a Texas corporation with its principal place of business in Davidson County, Tennessee; CHC Holdings, Inc., a Texas corporation with its principal place of business in Davidson County, Tennessee; Riverside Hospital, Inc., a Delaware corporation with its principal place of business in Davidson County, Tennessee; and Women's Hospital Indianapolis, L.P., a Delaware limited partnership. Women's Hospital Indianapolis, L.P. has one partner: Women's Hospital

Indianapolis GP, Inc., a Delaware corporation with a principal place of business in Davidson County, Tennessee. By and through itself and its parent entities, Bay Area Healthcare Group, Ltd. is a citizen of the States of Texas, Tennessee, and Delaware.

2. Plaintiff KPH-Consolidation, Inc. d/b/a HCA Houston Healthcare North Cypress ("North Cypress") is a hospital operating in Texas. KPH-Consolidation, Inc. is a Texas corporation with its principal place of business in Davidson County, Tennessee. KPH-Consolidation, Inc. is a citizen of Texas and Tennessee.

3. Plaintiff Lone Peak Hospital, Inc. d/b/a Lone Peak Hospital ("Lone Peak") is a hospital operating in Utah. Lone Peak Hospital, Inc. is a Utah corporation with its principal place of business in Davidson County, Tennessee. Lone Peak Hospital, Inc. is a citizen of Utah and Tennessee.

4. Plaintiff HTI Memorial Hospital Corporation d/b/a TriStar Skyline Medical Center ("Skyline") is a hospital operating in Tennessee. HTI Memorial Hospital Corporation is a Tennessee corporation with its principal place of business in Davidson County, Tennessee. HTI Memorial Hospital Corporation is a citizen of Tennessee.

5. Plaintiff Midwest Division-RBH, LLC d/b/a Belton Regional Medical Center ("Belton") is a hospital operating in Missouri. Midwest Division-RBH, LLC is a Missouri limited liability company with one member: HCA Health Services of

Louisiana, Inc., a Louisiana corporation with its principal place of business in East Baton Rouge Parish, Louisiana. Midwest Division-RBH, LLC Medical Center is a citizen of Louisiana.

6. Plaintiff MH Mission Hospital, LLLP d/b/a Mission Hospital ("Mission") is a hospital operating in North Carolina. MH Mission Hospital, LLLP is a Delaware limited liability limited partnership. MH Mission Hospital, LLLP has two partners: MH Master, LLC, a Delaware limited liability company, and MH Master Holdings, LLLP, a Delaware limited liability limited partnership. MH Master, LLC has one member: MH Master Holdings, LLLP. MH Master Holdings, LLLP has two partners: MH Hospital Manager, LLC, a Delaware limited liability company; and MH Hospital Holdings, Inc., a Delaware corporation with its principal place of business in Davidson County, Tennessee. MH Hospital Manager, LLC has only one member: MH Hospital Holdings, Inc. (a Delaware corporation that is the same entity that is a partner in MH Master Holdings, LLLP). Accordingly, MH Mission Hospital, LLLP's citizenship depends on MH Hospital Holdings, Inc.'s citizenship. MH Hospital Holdings, Inc. is a Delaware corporation with its principal place of business in Davidson County, Tennessee. MH Mission Hospital, LLLP is a citizen of Delaware and Tennessee.

7. Plaintiff Midwest Division-OPRMC, LLC d/b/a Overland Park Regional Medical Center ("Overland Park") is a hospital operating in Kansas.

Midwest Division-OPRMC, LLC is a Delaware limited liability company with one member: Hospital Corp., LLC, a Delaware limited liability company. Hospital Corp., LLC has one member: HCA Squared, LLC, a Delaware limited liability company. HCA Squared, LLC has one member: Healthtrust, Inc. - The Hospital Company, a Delaware corporation with its principal place of business in Davidson County, Tennessee. Midwest Division-OPRMC, LLC is a citizen of Delaware and Tennessee.

8. Defendant Anthem GA is a Georgia corporation with its principal place of business located at 740 W. Peachtree St., Atlanta, Georgia 30308. For purposes of diversity jurisdiction, Anthem GA is a citizen of Georgia. Anthem GA can be served with process through its registered agent, The Corporation Company, at 410 Peachtree Parkway, Suite 4245, Cumming, Georgia 30041.

## JURISDICTION AND VENUE

9. This Court has personal jurisdiction over Defendant because Defendant is domiciled in Georgia and conducts business in Georgia.

10. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because this dispute is between completely diverse parties and involves an amount in controversy that is greater than $75,000.

11. Venue is proper in the Northern District of Georgia, Atlanta Division pursuant to 28 U.S.C. § 1391(b)(1), (c)(2), and (d) because Defendant is domiciled in Atlanta, Georgia, and Defendant maintains its principal place of business in

Atlanta, Georgia, which is located in the Northern District of Georgia, Atlanta Division.

## FACTUAL BACKGROUND

### I. THE AGREEMENTS AND THE BLUECARD PROGRAM

12. Plaintiffs are acute care hospital systems located in the states of Texas, Utah, Tennessee, Missouri, North Carolina, and Kansas. Plaintiffs provide medically necessary services to patients in their local communities.

13. As part of their provision of medically necessary services, Plaintiffs contract with local Blue Cross and Blue Shield ("BCBS") plans through several agreements. Specifically:

i. Plaintiffs Corpus Christi and North Cypress, by and through their disclosed agent, Gulf Coast Division, Inc., contracted with non-party Blue Cross and Blue Shield of Texas ("BCBSTX") under the Hospital Agreement for PPO/POS Network Participation (eff. Nov. 1, 2016, as amended) ("BCBSTX Agreement");

ii. Plaintiff Lone Peak, by and through its disclosed agent, Mountain Division, Inc., contracted with non-party Regence BlueCross BlueShield of Utah ("Regence UT") under the Regence BlueCross BlueShield of Utah Participating Hospital Agreement (eff. Mar. 1, 2017) (as amended, the "Regence UT Agreement");

iii. Plaintiff Skyline contracted with non-party BlueCross BlueShield of Tennessee ("BCBSTN") under the BlueCross BlueShield of Tennessee Institution Agreement (eff. Apr. 1, 2004, as amended) ("BCBSTN Agreement");

iv. Plaintiffs Belton and Overland Park, by and through their disclosed agent, MidAmerica Division, Inc., contracted with non-party Blue Cross and Blue Shield of Kansas City ("BCBSKC") under the Blue Cross and Blue Shield of Kansas City Hospital Network Agreement (eff. Jan. 1, 2000, as amended) ("BCBSKC Agreement"); and

v. Plaintiff Mission, by and through its disclosed agent, MH Hospital Manager, LLC, contracted with non-party Blue Cross and Blue Shield of North Carolina ("BCBSNC") under the Network Participation Agreement – Facility Services (eff. Apr. 1, 2021, as amended) ("BCBSNC Agreement," or collectively with the BCBSTX Agreement, Regence UT Agreement, BCBSTN Agreement, and BCBSKC Agreement, the "Agreements").[1]

14. The Agreements specify the terms and conditions under which

[1] The Agreements contain confidentiality provisions that prevent Plaintiffs from attaching them to this Complaint. The Agreements will be produced pursuant to a valid discovery request once a protective order has been entered.

Plaintiffs will treat patients with BCBS health plans, referred to in the Agreements and herein as "subscribers,"[2] and be reimbursed for that treatment. Under the Agreements, Plaintiffs are entitled to be paid specified rates for the provision of medically necessary services to a subscriber. [3]

15. The Agreements are far broader than the relationship between just BCBSTX, Regence UT, BCBSTN, BCBSKC, and BCBSNC (collectively, the "Host Plans"), Plaintiffs, and subscribers enrolled in the Host Plans, however. The Agreements also cover treatment that Plaintiffs provide through the "Blue Cross Blue Shield Out of Area Program," "Inter-Plan Program," or "BlueCard Program," (referred to collectively hereinafter as the "BlueCard Program") to any subscribers enrolled in any BCBS health plan, including subscribers who are insured by another state's BCBSA licensee. Anthem GA is the BCBSA licensee for the State of Georgia, and when the patients at issue in this dispute, who were insured by Anthem GA (the "Subscribers"), received medical care at the Hospitals in Texas, Utah, Tennessee,

[2] When used generally herein, the term "subscribers" is not capitalized. When the term is used to refer to the specific patients at issue in this dispute, the defined term "Subscribers" is used.

[3] The Agreements set forth specific rates for covered services. The confidentiality provisions in the Agreements prevent Plaintiffs from reciting the rates herein. The rates also constitute Plaintiffs' proprietary information. As noted above, the Agreements, including their rate provisions, will be produced pursuant to a valid discovery request once a protective order has been entered.

Missouri, Kansas, and North Carolina, the claims associated with such care were properly initially submitted to the Host Plans (BCBSA licensees for the States of Texas, Utah, Tennessee, Missouri, Kansas, and North Carolina) for processing in accordance with the terms of the Host Plans' contracts with the Hospitals, which are the Agreements. Anthem GA is bound, and at all material times intended to be bound, by the Agreements in multiple ways: (a) by reason of its status as an "Affiliate" of the BCBSA; (b) as a "Payor/Payer," "Plan," or "Benefit Plan" responsible for payment; and (c) by its participation in the BlueCard Program, which is explained in more detail below.

16. Under the Agreements, (i) Plaintiffs will provide services to subscribers of out-of-state BCBS plans through the BlueCard Program; (ii) such out-of-state BCBS plans, as "Affiliates" of the BCBSA, or as a "Payor/Payer," "Plan," or "Benefit Plan" responsible for payment, intentionally access the discounted rates set forth in the Agreements when Plaintiffs provide services to their subscribers through the BlueCard Program; and (iii) the out-of-state plans, as "Affiliates" of the BCBSA, or as a "Payor/Payer," "Plan," or "Benefit Plan" responsible for payment, are bound by the terms and conditions of the Agreements when Plaintiffs provide services to their subscribers through the BlueCard Program, which terms and conditions include the obligation to pay claims in accordance with and at the rates in the Agreements.

*BCBSTX Agreement*

17. The BCBSTX Agreement specifically allows "Affiliates" of the BCBSA and particularly, other BCBS plans through the BlueCard Program, access to the benefits of the BCBSTX Agreement (namely, in-network reimbursement rates), provided the "Affiliates" comply with the terms and provisions of the BCBSTX Agreement.

18. Further, the BCBSTX Agreement provides that Corpus Christi and North Cypress will provide covered services to subscribers of "Affiliates," which includes Anthem GA, as set forth in and subject to the terms and conditions of the BCBSTX Agreement.

19. Anthem GA did in fact access and rely upon the BCBSTX Agreement.

20. Also under the BCBSTX Agreement, Anthem GA, by participating in the BlueCard Program, agreed to be a "Payer."

21. The BCBSTX Agreement provides that BCBSTX and any "Payer," which includes entities that are financially responsible for the payment of services under a health plan administered by BCBSTX and with which BCBSTX directly or indirectly contracts, are bound by the BCBSTX Agreement, including its provisions concerning the payment of claims.

22. The definition of "Payer" in the BCBSTX Agreement includes participants in the BlueCard Program, like Anthem GA, because, under the BlueCard Program, Anthem GA is financially responsible for the claims submitted for services

provided to its subscribers, and Anthem GA partially delegates its duties as health plan administrator to BCBSTX for the processing of BlueCard claims.[4]

23. Accordingly, when Anthem GA accessed Corpus Christi's and North Cypress's services and discounted rates under the BCBSTX Agreement through the BlueCard Program, Anthem GA became obligated as an "Affiliate" of the BCBSA and a "Payer" under the BCBSTX Agreement, to pay Corpus Christi and North Cypress at the rates set forth in the BCBSTX Agreement.

*Regence UT Agreement*

24. Similarly, under the Regence UT Agreement, Anthem GA meets the definition of "Payor," as such definition expressly includes BCBS plans that contract with Regence UT and assume financial responsibility for the payment of a subscriber's care.

25. Upon information and belief, Anthem GA and Regence UT directly or indirectly contract concerning their participation in the BlueCard Program.

26. The Regence UT Agreement provides that when "Payors" access the terms of the Regence UT Agreement, the "Payors" are obligated to reimburse Lone Peak in accordance with the payment provisions and at the rates set forth in the

[4] *See Health Care Serv. Corp. v. Methodist Hosps. of Dallas*, 814 F.3d 242, 246 (5th Cir. 2016) ("BCBS TX [in that case acting as a Host Plan] acts as the administrator for . . . claims arising under the BlueCard program.").

Regence UT Agreement.

*BCBSTN Agreement*

27. The BCBSTN Agreement expressly provides that entities accessing the terms of the BCBSTN Agreement, including Skyline's services and discounted reimbursement rates, through the BlueCard Program are "Affiliates" of the BCBSA and are subject to the terms of the BCBSTN Agreement, including its payment obligations, to the same extent as BCBSTN.

28. Accordingly, when Anthem GA accessed Skyline's services and discounted rates under the BCBSTN Agreement through the BlueCard Program, Anthem GA became obligated as an "Affiliate" under the BCBSTN Agreement, to pay Skyline at the rates set forth in the BCBSTN Agreement.

*BCBSKC Agreement*

29. The BCBSKC Agreement expressly provides that entities accessing the terms of the BCBSKC Agreement, through the BlueCard Program are "Affiliates" of BCBSKC and are subject to the terms of the BCBSKC Agreement, including its payment obligations. Anthem GA accessed Belton's and Overland Park's services and discounted reimbursement rates under the BCBSKC Agreement through the BlueCard Program and is therefore an "Affiliate" of the BCBSA under the BCBSKC Agreement.

30. Under the BCBSKC Agreement, Anthem GA also meets the definition

of "Payor," because such definition expressly applies to BCBSKC and its "Affiliates," as well as to other BCBS plans accessing the BCBSKC Agreement, such as Anthem GA.

31. The BCBSKC Agreement requires "Payors" and "Affiliates" to reimburse Belton and Overland Park for services provided to subscribers of BCBS plans in accordance with the terms and conditions of the BCBSKC Agreement and at the rates set forth in the BCBSKC Agreement.

32. Accordingly, when Anthem GA accessed Belton and Overland Park's services and discounted rates under the BCBSKC Agreement through the BlueCard Program, Anthem GA became obligated as an "Affiliate" and "Payor" under the BCBSKC Agreement, to pay Belton and Overland Park at the rates set forth in the BCBSKC Agreement.

*BCBSNC Agreement*

33. The BCBSNC Agreement obligates "Benefit Plans," which expressly include BCBSA licensees accessing the BCBSNC Agreement through the BlueCard Program, such as Anthem GA, to pay Mission at the rates set forth in the BCBSNC Agreement.

34. Specifically, "Benefit Plans" are "Payors" under the BCBSNC Agreement, and the BCBSNC Agreement provides that "Payors" are contractually obligated to reimburse Mission at the rates in the BCBSNC Agreement.

35. Accordingly, when Anthem GA accessed Mission's services and discounted rates under the BCBSNC Agreement through the BlueCard Program, Anthem GA became obligated as a "Benefit Plan" and "Payor" under the BCBSNC Agreement, to pay Mission at the rates set forth in the BCBSNC Agreement.

36. Accordingly, under the Agreements, Anthem GA—as an "Affiliate," "Payer," "Payor," "Plan," and/or "Benefit Plan" responsible for payment under the Agreements—accessed the terms of the Agreements through the BlueCard Program and is required, and agreed, to pay the Hospitals for the services provided to the Subscribers in accordance with the payment provisions and at the rates set forth in the Agreements.

*The BlueCard Program*

37. Under the BlueCard Program, providers submit their claims to the local BCBSA licensee, referred to as the Host Plan, for the services they provide to a subscriber. Upon information and belief, the Host Plan then reviews the claim, determines the amount payable under the providers' agreements with the Host Plan, and forwards the claim to the BCBS health plan that insures the subscriber or administers the subscriber's health plan (referred to as the "Home Plan"). Upon information and belief, the Home Plan then applies the subscriber's plan benefits, makes coverage determinations, approves or denies payment for the services, and transmits its decision and payment to the Host Plan. The Host Plan, in turn, transmits

the Home Plan's decision and payment to the provider. Importantly, the payment rates and payment provisions specified in the agreements between the Host Plan and the providers govern the amount providers are entitled to be reimbursed for the services provided to the subscriber, regardless of whether that subscriber is a participant in the Host Plan health plan or the Home Plan health plan. The Home Plan accesses and specifically relies upon the rates and payment provisions specified in the providers' agreements with the Host Plan when making payment.

38. In the present case, Anthem GA is the Home Plan for the Subscribers. Plaintiffs rendered services to the Subscribers and submitted their claims for such services to the Host Plans for forwarding to, and payment from, Anthem GA through the BlueCard Program. Accordingly, and consistent with how the BlueCard Program operates, Plaintiffs expected Anthem GA to reimburse them for the services provided to Anthem GA's Subscribers in accordance with the payment provisions and at the rates set forth in the Agreements.

39. Plaintiffs' expectations of reimbursement by Anthem GA at the rates specified in the Agreements were reinforced by Anthem GA's own conduct and representations, which are consistent with, if not express admissions of, Anthem GA being bound by the Agreements as an "Affiliate," "Payer," "Payor," "Plan," and/or "Benefit Plan" responsible for the claims at issue herein.

40. Upon information and belief, Anthem GA represents on its website that

the Hospitals are "in-network" with Anthem GA (meaning they are contracted with Anthem GA).

41. Specifically, Anthem GA includes a page on its website where its subscribers with Georgia health plans can locate care.[5] Using the "Find Care" tool on Anthem GA's website reveals that Anthem GA is "in-network" with the Hospitals for each of the Subscribers' health plans.[6]

42. Anthem GA's website explains the difference between "in-network" and "out of network" as follows: "Doctors, hospitals, . . . may have a contract with us. If they do, they're in our network - also called *in-network providers*. . . . If they don't have a contract with us, they're outside of our network - or *out of network providers*."[7]

43. Further, in a provider manual published on Anthem GA's website (the

[5] *See Individual & Family Health Insurance Plans in Georgia*, Anthem (last visited Sept. 24, 2026), https://www.anthem.com/ga/individual-and-family/health-insurance. A printout of the webpage is attached hereto as Exhibit 1.

[6] *See Find Care*, Anthem (last visited Sept. 24, 2026), https://www.anthem.com/find-care/. Samples of the search results using Anthem GA's "Find Care" tool showing the Hospitals as "in-network" for the Subscribers are attached hereto as Collective Exhibit 2. The result for Skyline is from a different Blue Cross Blue Shield Find Care tool, which can be found at https://www.bcbs.com/member-services/find-a-doctor.

[7] *See Frequently Asked Questions (FAQ) in Georgia: Doctors – Hospitals – Facilities*, Anthem (last visited Sept. 24, 2026), https://www.anthem.com/ga/faqs#7 (emphasis in original). A printout of Anthem's Georgia FAQ page is attached hereto as Exhibit 3.

"Provider Manual"), Anthem GA explains, "BlueCard is a national program that enables members of one BCBS Plan to obtain healthcare service benefits while traveling or living in another BCBS Plan's service area. The program links participating healthcare providers with the independent BCBS Plans across the United States and in more than 200 countries and territories worldwide through a single electronic network for claims processing and reimbursement."[8]

44. The Provider Manual also includes illustrations of how the BlueCard Program operates, which demonstrate that when a Home Plan's subscriber receives covered services in another state, the Home Plan "adjudicates the claim according to the member's benefits and the provider's arrangement with the [Host Plan]."[9] This means that the Home Plan must pay for the covered services provided to its subscriber at the rates specified in the Host Plan's contract with the provider.[10]

45. The Host Plan serves as the administrator for the subscribers' health

---

[8] *See GA BlueCard Provider Manual – 2022*, Anthem (last visited Sept. 24, 2026), https://www.anthem.com/content/dam/digital/docs/provider/commercial/manuals/PM_GA_00004.pdf. Relevant excerpts from the Provider Manual are attached hereto as Exhibit 4.

[9] *See id*.

[10] *See In re: Blue Cross Blue Shield Antitrust Litigation* (MDL No. 2406), 308 F. Supp. 3d 1241, 1255 (N.D. Ala. 2018) ("Through the BlueCard program, the Plans have agreed that when a contracted provider treats a patient covered by a Home Plan . . . the Home Plan will reimburse the provider at a rate which equals (at a minimum) the levels received for providers under the provider's contract with its Host Plan.").

plans when it handles claims through the BlueCard Program,[11] which is evidenced by the Host Plan charging, upon information and belief, an administration fee to the Home Plan. The Host Plan also, upon information and belief, charges an access fee to the Home Plan for access to the rates in the Host Plan's contract with the provider.[12]

46. Upon information and belief, the Home Plan accounts for all payments made under the BlueCard Program for the Home Plan's subscribers as an expense on its federal taxes, evidencing the Home Plan's financial responsibility for BlueCard claims.

47. Upon information and belief, participation in the BlueCard Program is a required term of the license agreements between BCBSA and all BCBS licensees.[13]

48. Through this expressly linked network of contracts, the BlueCard Program essentially operates as a rental network: the Host Plan contracts with local

---

[11] *See Health Care Serv. Corp. v. Methodist Hosps. of Dallas*, 814 F.3d at 246 ("BCBSTX [there, acting as the Host Plan] acts as the administrator for . . . claims arising under the BlueCard program.").

[12] *See In re: Blue Cross Blue Shield Antitrust Litigation*, 308 F. Supp. 3d at 1255 ("Under BlueCard Rules, an access fee may be charged in connection with processing BlueCard claims, but that fee can be, and is frequently, negotiated or waived.").

[13] *See id.* at 1254 ("Under BlueCard, Plans were required to make their local provider discounts available to all Blue Members, even if they lived in another Plan's service area.").

providers, the local providers agree to treat subscribers of other out-of- area BCBS health plans under the BlueCard Program, and the Home Plan accesses and pays the negotiated rates in the Host Plan's contracts with the local providers when its subscribers receive care from the local providers.

49. Applying the mechanics of the BlueCard Program to the present dispute, the BlueCard Program should have operated as follows: Anthem GA is the Home Plan for the Subscribers. The Subscribers received care at the Hospitals in Texas, Utah, Tennessee, Kansas, Missouri, and North Carolina. Plaintiffs submit their claims for reimbursement for the services they provide to the Subscribers to the Host Plans for their respective states. Then, the Host Plans, acting as administrators of the Subscribers' health plans, review the claims, determine the amount that would be payable under the Agreements based on the services Plaintiffs provided to the Subscribers, and forward the claims to Anthem GA (the Home Plan) for adjudication/payment. Anthem GA, as the Home Plan, applies the Subscribers' health benefits, makes coverage determinations, and approves or denies payment for the services, at the rates set forth in the Agreements. The Host Plans then transmit Anthem GA's decisions and payments to Plaintiffs.

50. Accordingly, and consistent with how the BlueCard Program operates, Plaintiffs expected Anthem GA to reimburse Plaintiffs for the services provided to its Subscribers at the rates, and upon the terms, specified in the Agreements, which

are the rates Anthem GA agreed to pay, by virtue of its participation in the BlueCard Program; as an "Affiliate," "Payer," "Payor," "Plan," and/or "Benefit Plan" under the Agreements.

51. Additionally, for at least some of the Subscribers at issue in this dispute, Plaintiffs received correspondence or communications directly from Anthem GA, as opposed to the Host Plans, concerning the claims at issue, including authorization decisions and partial payments, further evidencing Anthem GA's acknowledgment of responsibility for the claims.

52. Anthem GA's Subscribers received medical services from Plaintiffs through the BlueCard Program, and accordingly, as an "Affiliate," "Payer," "Payor," "Plan," and/or "Benefit Plan" responsible for payment of the claims associated with such care under the Agreements, Anthem GA is contractually bound by the Agreements, including their provisions obligating the "Affiliates," "Payers," "Payors," "Plans," and/or "Benefit Plans" to timely and correctly pay claims at the rates set forth therein. Anthem GA failed to pay Plaintiffs in accordance with the Agreements.

## II. FACTS CONCERNING THE CLAIMS AT ISSUE

53. Patient 1, Outpatient Procedure Performed in 2025:[14] At the time

[14] The Subscribers at issue in this Complaint have been de-identified in accordance with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

services were rendered, Patient 1 was a 36-year-old female with a history of morbid obesity with comorbidities, including generalized edema, gastroesophageal reflex disease, migraine headaches, a diaphragmatic hernia, and diabetes mellitus that failed to be remedied with multiple weight management interventions, therapy, behavior changes, and modifications. Patient 1 presented to Corpus Christi for a robotic vertical sleeve gastrectomy, a robotic paraoesophageal hernia repair with mesh, and an intraoperative endoscopy with an upper gastrographic swallow evaluation and intravenous fluids for proton pump inhibitor, nausea, and pain medicines. Patient 1 tolerated the procedure well and was discharged the next day after a brief recovery period.

54. Patient 1 presented to Corpus Christi with insurance through Anthem GA and supplemental insurance through Lantern (formerly known as Surgery Plus Employee Direct SCA). Lantern initially appeared to be Patient 1's primary insurance, and Corpus Christi determined that Lantern did not require authorization for Patient 1's procedure. On March 25, 2025, Corpus Christi timely submitted a claim for the services provided to Patient 1 to Lantern. Then, on April 3, 2025, it was determined that Anthem GA was Patient 1's primary insurance, and Lantern was secondary. Accordingly, on May 2, 2025, Corpus Christi submitted a claim for the services provided to Patient 1 to BCBSTX for forwarding to Anthem GA. By explanation of benefits ("EOB") dated June 17, 2025, BCBSTX denied the claim,

alleging that "[c]overage/program guidelines were not met." On June 24, 2025, Corpus Christi learned that the denial was for a purported lack of authorization.

55. On or about July 1, 2025, Corpus Christi timely submitted a first-level appeal to BCBSTX for forwarding to Anthem GA, enclosed a copy of Patient 1's medical records, and requested a medical necessity review. On July 23, 2025, Corpus Christi contacted BCBSTX concerning the status of the appeal, and a representative of BCBSTX informed Corpus Christi that the appeal was under review. By correspondence dated July 31, 2025, Anthem GA claimed they retroactively denied authorization for Patient 1's inpatient admission. On August 6, 2025, Corpus Christi again contacted BCBSTX concerning the status of the appeal, and a representative of BCBSTX informed Corpus Christi that the appeal was under review. Then, BCBSTX forwarded the claim for Patient 1 to Anthem GA for reprocessing in lieu of Anthem GA adjudicating the first-level appeal, and by EOB dated August 7, 2025, BCBSTX, on behalf of Anthem GA, denied the claim for a purported lack of medical necessity.

56. On September 11, 2025, in lieu of a second-level appeal, Corpus Christi timely submitted a corrected claim to BCBSTX for forwarding to Anthem GA to bill the services as outpatient, rather than inpatient, services. By EOB dated September 18, 2025, BCBSTX, on behalf of Anthem GA, denied the claim on grounds that the claim was allegedly unprocessable due to incomplete and/or invalid information.

57. The denial of Corpus Christi's claim for the services rendered to Patient 1 based on a purported lack of authorization and/or medical necessity constituted a wrongful denial of benefits and should be reversed.

58. First, the services provided to Patient 1 were medically necessary, as evidenced by Patient 1's medical records and supported by the fact that the services provided met Anthem GA's own policy Bariatric Surgery and Other Treatments for Clinically Severe Obesity. Under the BCBSTX Agreement, Anthem GA must pay for medically necessary services.

59. Second, Anthem GA suffered no prejudice due to any alleged lack of authorization because Corpus Christi rendered medically necessary care to Patient 1.

60. In sum, Corpus Christi provided medically necessary, covered services to Patient 1 and is entitled to payment in full for those services. According to the terms of the BCBSTX Agreement, Corpus Christi is entitled to be paid $27,182.79 for the medically necessary, covered services it provided to Patient 1.

61. Patient 2, Admitted and Discharged in 2025: At the time services were rendered, Patient 2 was a 38-year-old male who presented to North Cypress's emergency department with complaints of left neck pain and left arm swelling. Patient 2 underwent a computed tomography ("CT") scan of his lungs, which indicated pneumonia and possible pulmonary embolism. Patient 2 underwent further

imaging of his chest, revealing a large fourteen-centimeter mass in the upper lobe of his left lung. Patient 2 was admitted as an inpatient per physician order for further oncologic evaluation and treatment.

62. During his admission, Patient 2 received radiation therapy, a cardiovascular surgery consultation, and antibiotic treatment for his pneumonia. After a complete blood count revealed Patient 2 was anemic, he underwent a transthoracic needle biopsy which produced inconclusive results. Patient 2 then underwent an endobronchial ultrasound with biopsy which again produced inconclusive results. Then, Patient 2 underwent a mediastinoscopy, a thoracotomy, left upper lobe wedge resection, and cryoablation of the intercostal nerves. Postoperatively, Patient 2 required a chest tube placement for pulmonary management. Patient 2 was ultimately diagnosed with B-cell lymphoma and was discharged home in stable condition with physician's orders to follow up with oncology on an outpatient basis.

63. Patient 2 presented to North Cypress with insurance through Anthem GA. North Cypress submitted a notice of admission to Anthem GA for Patient 2. By correspondence dated February 22, 2025, Anthem GA denied authorization for the first two days of Patient 2's admission for a purported lack of medical necessity, but through Availity (a web portal utilized by Anthem GA), Anthem GA approved the remaining 19 days of Patient 2's admission.

64. On March 17, 2025, North Cypress timely submitted a claim for the services provided to Patient 2 to BCBSTX for forwarding to Anthem GA. On April 23, 2025, BCBSTX, on behalf of Anthem GA, requested additional medical records, and on May 7, 2025, North Cypress mailed medical records for Patient 2 to BCBSTX for forwarding to Anthem GA. BCBSTX, on behalf of Anthem GA also repeatedly requested itemized bills from North Cypress, which North Cypress provided. Thereafter, North Cypress followed up with BCBSTX concerning the status of the claim multiple times from June 13, 2025, through July 22, 2025, and the claim remained under review. On July 22, 2025, BCBSTX, on behalf of Anthem GA, informed North Cypress that the denial was upheld but requested an itemized bill, which North Cypress provided. By EOB dated July 25, 2025, BCBSTX, on behalf of Anthem GA, denied the claim due to a purported lack of medical necessity.

65. On or about July 25, 2025, North Cypress timely submitted a request for reconsideration to BCBSTX for forwarding to Anthem GA, enclosed a copy of Patient 2's medical records, and requested a medical necessity review. By EOB dated August 26, 2025, BCBSTX, on behalf of Anthem GA, denied the claim in full for a purported lack of medical necessity. On September 17, 2025, North Cypress followed up BCBSTX concerning the status of the first-level appeal, and a representative of BCBSTX informed North Cypress that the first-level appeal had been exhausted. By correspondence dated September 17, 2025, BCBSTX, on behalf

of Anthem GA, confirmed that the claim was denied for a purported lack of medical necessity.

66. On or about October 14, 2025, North Cypress timely submitted an appeal to BCBSTX for forwarding to Anthem GA, enclosed a copy of Patient 2's medical records, and requested a medical necessity review. By EOB dated November 21, 2025, BCBSTX, on behalf of Anthem GA, upheld the denial for lack of medical necessity.

67. The denial of North Cypress's claim for the services rendered to Patient 2 based on a purported lack of medical necessity constituted a wrongful denial of benefits and should be reversed.

68. First, at least some portion of the billed services constituted emergency and post-stabilization care services for which Anthem GA is required to pay under state and federal law. *See* 42 CFR § 438.114; Tex. Ins. Code §1301.155; Ga. Comp. R. & Regs. 120-2-106-.05.

69. Second, the inpatient services provided to Patient 2 were medically necessary, as evidenced by Patient 2's medical records.

70. Third, Anthem GA authorized at least a portion of Patient 2's admission. Anthem GA is prohibited from denying payment for the medically necessary services provided by North Cypress under these circumstances. *See* Tex. Ins. Code Section 1301.135(f); Ga. Code Ann. § 33-20A-62 (f); Ga. Code Ann. §

33-20A-7.1(b). Further, under the BCBSTX Agreement, authorized services must be paid unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here.

71. In sum, North Cypress provided medically necessary, covered services to Patient 2 and is entitled to payment in full for those services. According to the terms of the BCBSTX Agreement, North Cypress is entitled to be paid $214,329.74 for the services provided to Patient 2.

72. Patient 3, Admitted and Discharged in 2025: At the time services were rendered, Patient 3 was a newborn infant male who was born at Corpus Christi via vaginal delivery at 38 weeks and 6 days' gestation. The delivery was complicated by meconium staining. Following the delivery, Patient 3 was admitted to the newborn nursery for routine newborn care. Shortly thereafter, he developed hypoglycemia, requiring a higher level of monitoring and treatment. Patient 3 was transferred to Corpus Christi's neonatal intensive care unit for further management and stabilization, per physician order. Upon admission, Patient 3 required frequent glucose monitoring and intensive medical intervention to maintain appropriate blood glucose levels. During his admission, he received intravenous treatment to correct his hypoglycemia and prevent further complications associated with low blood sugar levels, was fed every three hours, underwent serial glucose monitoring to ensure stabilization, underwent a sepsis evaluation, and received intravenous antibiotics.

Patient 3's condition substantially improved, and he was discharged in stable condition after four days of inpatient admission.

73. Patient 3's mother presented to Corpus Christi with insurance through Anthem GA. Patient 3's coverage was not active until after he had already been discharged, which prevented Corpus Christi from requesting prior authorization for Patient 3's inpatient admission.

74. On March 21, 2025, Corpus Christi timely submitted a claim for the services provided to Patient 3 to BCBSTX for forwarding to Anthem GA. By EOB dated April 29, 2025, BCBSTX, on behalf of Anthem GA, paid $10,848.00 towards the claim and denied the remainder for a purported lack of authorization.

75. On or about November 17, 2025, Corpus Christi timely submitted a first-level appeal to BCBSTX for forwarding to Anthem GA, enclosed copy of Patient 3's medical records, and requested a medical necessity review. On December 10 and 15, 2025, Corpus Christi attempted to contact BCBSTX concerning the status of the appeal but was unable to reach a representative. On December 18, 2025, Corpus Christi learned through Availity that the appeal had been received and was under review. By correspondence from Anthem GA dated January 13, 2026, Anthem GA denied authorization for the services provided to Patient 3 for purported lack of medical necessity. By correspondence dated January 17, 2026, BCBSTX, on behalf of Anthem GA, requested a refund of its partial payment, alleging incorrectly and

without explanation that the claim for Patient 3 was submitted by Corpus Christi in error.

76. On or about February 17, 2026, Corpus Christi timely submitted a second-level appeal to BCBSTX for forwarding to Anthem GA. On or about March 12, 2026, Corpus Christi contacted BCBSTX concerning the status of the appeal and received a response via Availity that it was under review. By correspondence dated March 18, 2026, and April 10, 2026, BCBSTX, on behalf of Anthem GA, again requested a refund of its partial payment for the claim on grounds that the claim was allegedly submitted by Corpus Christi in error. By correspondence dated April 20, 2026, BCBSTX informed Corpus Christi that Anthem GA upheld the partial denial of the claim. By EOB dated May 1, 2026, BCBSTX, on behalf of Anthem GA, recouped the partial payment made on the claim for Patient 3 and denied the claim in full based on a purported lack of medical necessity.

77. The denial of Corpus Christi's claim for the services rendered to Patient 3 based on a purported lack of medical necessity constituted a wrongful denial of benefits and should be reversed.

78. The services rendered were medically necessary as evidenced by Patient 3's medical records. Under the BCBSTX Agreement, Anthem GA must pay for medically necessary covered services even if they were not authorized.

79. Further, Anthem GA is prohibited under federal law from denying at

least some portion of Patient 3's post-delivery admission. *See* Newborns' and Mothers' Health Protection Act of 1996, Pub. L. No. 104-204, 110 Stat. 2935.

80. In sum, Corpus Christi provided medically necessary, covered services to Patient 3 and is entitled to payment in full for those services. According to the terms of the BCBSTX Agreement, Corpus Christi is entitled to be paid $27,120.00 for the medically necessary, covered services it provided to Patient 3.

81. <u>Patient 4, Outpatient Procedure Performed in 2024</u>: At the time services were rendered, Patient 4 was a 43-year-old female with a history of back pain and leg pain that failed to be remedied by conservative treatment and previous diskectomies. Magnetic resonance imaging of Patient 4's back showed recurrent rectal reticular disc extraction with inferior migration and impingement of descending right S1 disc and moderately severe disc degeneration with Modic changes at L5-S1 disc with eccentric right sided prolapse. Patient 4 presented to Lone Peak for a scheduled bilateral posterolateral fusion at L5-S1, bilateral pedicle screw instrumentation at L5-S1, and wide revision decompression at L5-S1 bilaterally. Patient 4 tolerated the procedure well and was discharged home the following day after a brief recovery period.

82. Patient 4 presented to Lone Peak with insurance through Anthem GA. On November 13, 2024, Lone Peak timely submitted a claim for the services provided to Patient 4 to Regence UT for forwarding to Anthem GA. By

correspondence dated December 12, 2024, Regence UT, on behalf of Anthem GA, requested medical records for Patient 4, which Lone Peak submitted on December 18, 2024. By EOB dated December 20, 2024, Regence UT, on behalf of Anthem GA, paid $804.71, but Anthem GA denied the charges associated with CPT code 22612 purportedly for lack of authorization and the charges associated with CPT code 64999 purportedly for purportedly missing information.[15]

83. On or about January 30, 2025, Lone Peak timely submitted an appeal to Regence UT for forwarding to Anthem GA, enclosed a copy of Patient 4's medical records, and requested a medical necessity review. From February 21, 2025, to May 1, 2025, Lone Peak contacted Regence UT multiple times, and each time, a representative of Regence UT informed Lone Peak that the appeal was under review. On May 8, 2025, Lone Peak sent medical records for Patient 4 to Anthem GA again.

84. On May 29, 2025, Lone Peak contacted Regence UT, and a representative of Regence UT indicated that Anthem GA required full medical records for Patient 4. Accordingly, on June 4, 2025, Lone Peak resubmitted its appeal via Availity, enclosed a copy of Patient 4's medical records, and requested a medical necessity review. On June 25, 2025, Lone Peak confirmed via Availity that the appeal

---

[15] CPT code 22612 is for posterior or posterolateral lumbar arthrodesis (spinal fusion) for a single vertebral level, and CPT code 64999 is for other procedures of the nervous system.

was received on June 4, 2025. On August 4, 2025, Lone Peak learned through Availity that the appeal was invalid due to purportedly missing medical records. On August 13, 2025, a representative of Regence UT responded through Availity that Anthem GA claimed there was no description available for CPT code 64999, and therefore, Anthem GA could not approve or deny the claim submitted for Patient 4. Lone Peak informed Regence UT that medical records had been submitted to Anthem GA and requested that Regence UT intervene to require Anthem GA to process the appeal.

85. On October 29, 2025, Lone Peak contacted Regence UT, and a representative from Regence UT informed Lone Peak that Anthem GA denied the appeal as a duplicate and requested that it be resubmitted with additional records. Accordingly, on November 5, 2025, Lone Peak resubmitted its appeal again via Availity, enclosed a copy of Patient 4's medical records, and requested a medical necessity review. Lone Peak confirmed through Availity on November 25, 2025, that the appeal was received. Anthem GA did not respond to Lone Peak's appeal.

86. The denial of Lone Peak's claim for the services rendered to Patient 4 based on purportedly missing documentation and/or lack of authorization constituted a wrongful denial of benefits and should be reversed.

87. First, the services provided to Patient 4 were medically necessary, as evidenced by Patient 4's medical records. Under the Regence UT Agreement,

Anthem GA is required to pay for medically necessary services and is not permitted to deny payment for lack of authorization alone.

88. Second, Lone Peak repeatedly submitted the documentation requested for Patient 4 to Anthem GA, and Anthem GA provided no substantive basis to deny its appeal or claim.

89. In sum, Lone Peak provided medically necessary, covered services to Patient 4 and is entitled to payment in full for those services. According to the terms of the Regence UT Agreement, Lone Peak is entitled to be paid $41,202.79 for the services provided to Patient 4.

90. Patient 5, Admitted and Discharged in 2024: At the time services were rendered, Patient 5 was a 39-year-old male who was transferred from another facility to Skyline's emergency department following a dirt bike accident in which he was thrown off the bike without a helmet. Patient 5 reported feeling "out of it," and an initial evaluation revealed that he suffered multiple tooth displacements, facial lacerations, and fractures. Patient 5 was started on intravenous fluids and antibiotics, and he was admitted as an inpatient per physician order for further evaluation. Patient 5 required neurological assessments every four hours. Patient 5 underwent surgical tooth removals, right maxillary alveoplasty, and multiple complex laceration repairs. Patient 5 tolerate the procedures well. Post-operatively, Patient 5 received intravenous analgesics and worked with physical and occupation therapy until he

was stable for discharge.

91. Patient 5 presented to Skyline with insurance through Anthem GA. Skyline requested authorization for Patient 5's inpatient admission, but Anthem GA denied authorization for lack of medical necessity. On September 26, 2025, Skyline participated in a peer-to-peer review of Anthem GA's denial of authorization, but Anthem GA upheld the denial due to a purported lack of medical necessity.

92. On October 2, 2024, Skyline timely submitted a claim for the services provided to Patient 5 to BCBSTN for forwarding to Anthem GA. By EOB dated November 6, 2024, BCBSTN, on behalf of Anthem GA, denied the claim in full for a purported lack of medical necessity.

93. On or about December 3, 2024, Skyline timely submitted a first-level appeal to BCBSTN for forwarding to Anthem GA, enclosed a copy of Patient 5's medical records, and requested a medical necessity review. Then, on January 16, 2025, Skyline re-billed the claim for Patient 5 to correct the charges billed for Patient 5. By EOB dated February 19, 2025, BCBSTN, on behalf of Anthem GA, denied the claim in full as a duplicate claim. On March 13, 2025, Skyline re-billed its claim for Patient 5 again, and by EOB dated April 2, 2025, BCBSTN, on behalf of Anthem GA, denied the claim in full for a purported lack of medical necessity.

94. On or about April 25, 2025, Skyline submitted a second-level appeal to BCBSTN for forwarding to Anthem GA, enclosed a copy of Patient 5's medical

records, and requested a medical necessity review. By correspondence dated May 9, 2025, BCBSTN, on behalf of Anthem GA, requested that Skyline submit a reconsideration form with its appeal. On May 21, 2025, however, Skyline contacted BCBSTN, and a representative of BCBSTN confirmed that the second-level appeal was under review. On June 18, 2025, Skyline contacted BCBSTN again, and a representative of BCBSTN stated that a reconsideration form was required. On or about June 20, 2025, Skyline re-submitted its second-level appeal as a reconsideration request to BCBSTN for forwarding to Anthem GA. On August 25, 2025, BCBSTN, on behalf of Anthem GA, rejected the second-level appeal, claiming a waiver signed by Patient 5 was required. Patient 5's authorization was not required because Patient 5 signed an acknowledgement form prior to his admission, thereby assigning his appeal rights to Skyline, and Skyline also had appeal rights under the BCBSTN Agreement. Notwithstanding, Skyline attempted to obtain a waiver signed by Patient 5 but was unable to do so. On September 19, 2025, Skyline re-submitted its second-level appeal. Anthem GA did not respond to Skyline's resubmitted second-level appeal.

95. The denial of Skyline's claim for the services rendered to Patient 5 based on a purported lack of medical necessity constituted a wrongful denial of benefits and should be reversed.

96. First, the services provided to Patient 5 were medically necessary, as

evidenced by Patient 5's medical records and supported by the fact that Patient 5's admission met InterQual criteria. Under the BCBSTN Agreement, Anthem GA is required to pay for medically necessary services.

97. Second, Anthem GA failed to provide any explanation supporting its denial of the services provided to Patient 5 based on a purported lack of medical necessity. This violates federal law, which requires a health plan to provide "[t]he specific reason or reasons for the adverse determination" and "[i]f the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request." *See* 29 C.F.R. § 2560.503-1(g)(1)(i), (v)(B).). This similarly violates Tennessee and Georgia state law. *See* Tenn. Code Ann. § 56-61-107(f); Ga. Code Ann. § 33-20A-5(3)(B)(ii).

98. Third, at least some portion of the billed services constituted emergency and post-stabilization care services for which Anthem GA is required to pay under Tennessee, Georgia, and federal law. *See* Tenn. Code Ann. § 56-7-2355(b); Ga. Comp. R. & Regs. 120-2-106-.05; 42 C.F.R. § 438.114 (eff. Jul. 5, 2016).

99. In sum, Skyline provided medically necessary, covered services to Patient 5 and is entitled to payment in full for those services. According to the terms

of the BCBSTN Agreement, Skyline is entitled to be paid $46,263.60 for the services provided to Patient 5.

100. Patient 6, Outpatient Services Provided in 2023: At the time services were rendered, Patient 6 was a 60-year-old male with a history of recurrent metastatic melanoma stage III cancer who presented to Belton for continued chemotherapy treatment. Patient 6 had undergone multiple types of chemotherapy treatments in the past, including clinical trials, without improvement in his condition. At Belton, Patient 6 started taking Opdualag due to unavailability of interferon therapy. Patient 6 required medication for treatment of nausea and intravenous heparin during his Opdualag infusion. Patient 6 tolerated the treatment well and was discharged on the same day.

101. Patient 6 presented to Belton with insurance through Anthem GA. Belton requested authorization for Patient 6's treatment, and Anthem GA authorized the treatment. On February 8, 2023, Belton timely submitted a claim for the services provided to Patient 6 to BCBSKC for forwarding to Anthem GA. By EOB dated March 20, 2023, BCBSKC, on behalf of Anthem GA, denied the claim in full for a purported lack of authorization.

102. By correspondence dated March 27, 2023, BCBSKC, on behalf of Anthem GA, informed Belton that the authorization issued by Anthem GA covered only one specific chemotherapy CPT code, and retroactive authorization was

required for the specific codes billed by Belton. On April 6, 2023, Belton contacted AmeriBen (a third-party administrator for Anthem GA) concerning the erroneous denial of the claim for Patient 1 based on a purported lack of authorization. A representative of AmeriBen explained that the authorization issued by Anthem GA was for CPT code J9999, which is a generic code for an unlisted chemotherapy drug. Belton billed the specific CPT code for Opdualag (CPT code J9298) in connection with the services provided to Patient 6, resulting in Anthem GA's erroneous denial. AmeriBen requested medical records for Patient 6 in order to process a retroactive authorization for the specific CPT code billed.

103. On or about April 7, 2026, Belton timely submitted medical records for Patient 6 with an appeal. From May 4, 2023, through October 9, 2023, Belton contacted BCBSKC concerning the status of the appeal, and each time, representatives of BCBSKC informed Belton that the appeal was still in review due to backlog and had been escalated. By correspondence dated October 9, 2023, AmeriBen, on behalf of Anthem GA, denied retroactive authorization for a purported lack of medical necessity based on the policy CarelonRX: Opdualag. In lieu of processing the first-level appeal, BCBSKC, on behalf of Anthem GA, reprocessed the claim for Patient 6. By EOB dated November 14, 2023, Anthem GA upheld the denial for a purported lack of medical necessity.

104. The denial of Belton's claim for the services rendered to Patient 6 based

on a purported lack of medical necessity constituted a wrongful denial of benefits and should be reversed.

105. The services provided to Patient 6 were medically necessary, as evidenced by Patient 6's medical records and supported by the fact that Patient 6's treatment met Anthem GA's own policy, CarelonRX: Opdualag. Under the BCBSKC Agreement, Anthem GA is required to pay for medically necessary services even if they are not authorized. Further, at least some portion of the services were in fact authorized by Anthem GA. Under the BCBSKC Agreement, Anthem GA is responsible for payment of authorized services.

106. In sum, Belton provided medically necessary, covered services to Patient 6 and is entitled to payment in full for those services. According to the terms of the BCBSKC Agreement, Belton is entitled to be paid $40,272.76 for the services provided to Patient 6.

107. <u>Patient 7, Admitted and Discharged in 2023</u>: At the time services were rendered, Patient 7 was a 41-year-old male who presented to Mission's emergency department as a trauma activation after being struck by a vehicle while riding his motorcycle. Upon evaluation at Mission, Patient 7 was found to have multiple fractures in his left arm and leg. Patient 7 was admitted as an inpatient per physician order and underwent a closed reduction of his left upper extremity injuries. Patient 7 was started on intravenous antibiotics, and then his left arm was splinted. Patient

7 was admitted to the orthopedic trauma service floor, and he underwent an open reduction internal fixation of his left humerus and incision and draining of his left elbow. Following the procedure, Patient 7 was discharged home in stable condition.

108. Patient 7 initially presented to Mission as uninsured. It was not until the day of Patient 7's discharge that Patient 7's spouse informed Mission that Patient 7 was insured but that she did not have the coverage information and would provide it later. It was not determined that Patient 7 had insurance through Anthem GA until 22 days after his date of discharge.

109. On September 22, 2023, Mission timely submitted a claim for the services provided to Patient 7 to BCBSNC for forwarding to Anthem GA. By EOB dated October 23, 2023, BCBSNC, on behalf of Anthem GA, denied the claim in full for a purported lack of authorization.

110. On or about October 6, 2023, Mission timely submitted an appeal, enclosed a copy of Patient 7's medical records, and requested a medical necessity review. On November 13, 2023, Mission contacted BCBSNC, and a representative of BCBSNC confirmed that the appeal was received. On December 5, 2023, Mission contacted BCBSNC again, and a representative of BCBSNC informed Mission that Anthem GA upheld its denial.

111. The denial of Mission's claim for the services rendered to Patient 7 based on a purported lack of authorization constituted a wrongful denial of benefits

and should be reversed.

112. First, under state and federal law, Mission is not required to obtain prior authorization for emergency services provided to patients. *See* 29 C.F.R. § 2590.715-2719A (eff. Sept. 13, 2021); N.C. Gen. Stat. Ann. § 58-3-190(a); Ga. Comp. R. & Regs. 120-2-106-.05. Patient 7 presented through Mission's emergency department under a trauma activation. Furthermore, Mission was unable to request authorization for Patient 7's admission, because, by no fault of Mission's, it was not determined that Patient 7 had insurance through Anthem GA until after his discharge.

113. Second, at least some portion of the billed services constituted emergency and post-stabilization care services for which Anthem GA is required to pay under North Carolina, Georgia, and federal law. *See* N.C. Gen. Stat. Ann. § 58-3-190(a); Ga. Comp. R. & Regs. 120-2-106-.05; 42 CFR § 438.114 (eff. Jul. 5, 2016).

114. Third, the services provided to Patient 7 were medically necessary, as evidenced by Patient 7's medical records. Under the BCBSNC Agreement, Anthem GA is required to pay for medically necessary services.

115. In sum, Mission provided medically necessary, covered services to Patient 7 and is entitled to payment in full for those services. According to the terms of the BCBSNC Agreement, Mission is entitled to be paid $71,635.25 for the services provided to Patient 7.

116. Patient 8, Admitted and Discharged in 2023: At the time services were rendered, Patient 8 was a 39-year-old male who presented to Overland Park's emergency department with complaints of heart palpitations, chest pain, let-arm numbness, racing heart, and shortness of breath with a history of exposure to COVID and previous tick bites. An initial evaluation of Patient 8 revealed hypokalemia, elevated lactic acid, elevated troponin, and sinus tachycardia. Patient 8 was initially admitted as an observation stay, but two days later, he was admitted as an inpatient per physician order for continued evaluation and treatment. Patient 8 underwent a electrophysiology study, followed by placement of an implantable loop recorder. Patient 8 also underwent testing and evaluation to rule out his exposure to COVID and previous tick bites as causes of his symptoms. Patient 8's telemetry revealed long-RP narrow complex regular tachycardia. Patient 8's medications were adjusted, and one his symptoms were managed, he was discharged in stable condition.

117. Patient 8 presented to Overland Park with insurance through Anthem GA. Overland Park timely notified Anthem GA of Patient 8's admission and submitted his medical records. On October 17, 2023, Overland Park contacted BCBSKC, and a representative of BCBSKC informed Overland Park that Anthem GA denied authorization for Patient 8's admission for a purported lack of medical necessity. On October 22, 2023, Overland Park timely submitted a claim for the services provided to Patient 8 to BCBSKC for forwarding to Anthem GA. By EOB

dated November 7, 2023, BCBSKC, on behalf of Anthem GA, denied the claim in full for a purported lack of medical necessity.

118. On or about November 9, 2023, Overland Park timely submitted a first-level appeal to BCBSKC for forwarding to Anthem GA, enclosed a copy of Patient 8's medical records, and requested a medical necessity review. From December 1, 2023, to December 13, 2023, Overland Park contacted BCBSKC concerning the status of the appeal, and each time, a representative of BCBSKC informed Overland Park that the appeal was pending review. By correspondence dated January 2, 2024, BCBSKC, on behalf of Anthem GA, informed Overland Park that the denial was upheld because the services provided to Patient 8 were purportedly not medically necessary and that all appeal rights had allegedly been exhausted.

119. On or about January 15, 2024, Overland Park timely submitted a second-level appeal to BCBSKC for forwarding to Anthem GA, enclosed a copy of Patient 8's medical records, and requested a medical necessity review. On February 9, 2024, Overland Park contacted BCBSKC concerning the status of the appeal, and a representative of BCBSKC informed Overland Park that the appeal was received on January 30, 2024, and was closed the same day because all appeal rights were purportedly exhausted. By correspondence dated February 21, 2024, BCBSKC, on behalf of Anthem GA, informed Overland Park that Anthem GA upheld the denial for a purported lack of medical necessity.

120. The denial of Overland Park's claim for the services rendered to Patient 8 based on a purported lack of medical necessity constituted a wrongful denial of benefits and should be reversed.

121. First, at least some portion of the billed services constituted emergency and post-stabilization care services for which Anthem GA is required to pay under Kansas, Georgia, and federal law. *See* Kan. Stat. Ann. § 40-4603; Ga. Comp. R. & Regs. 120-2-106-.05; 42 CFR § 438.114 (eff. Jul. 5, 2016).

122. Second, the services provided to Patient 8 were medically necessary, as evidenced by Patient 8's medical records. Under the BCBSKC Agreement, Anthem GA is required to pay for medically necessary services.

123. In sum, Overland Park provided medically necessary, covered services to Patient 8 and is entitled to payment in full for those services. According to the terms of the BCBSKC Agreement, Overland Park is entitled to be paid $33,206.71 for the services provided to Patient 8.

## CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT

124. The foregoing paragraphs are incorporated by reference.

125. As alleged above, Plaintiffs are parties to the Agreements, which provide the terms and conditions under which Plaintiffs will treat subscribers with BCBS health plans and be reimbursed for that treatment.

126. With respect to claims processed by the Host Plans for Anthem GA under the BlueCard Program, as set forth above, Anthem GA is an "Affiliate," "Payer," "Payor," "Plan," and/or "Benefit Plan" under the Agreements, and as expressly provided in the Agreements, Anthem GA is bound by the terms of the Agreements, including their payment terms.

127. The Agreements specifically allow "Affiliates" of the BCBSA and/or "Payors/Payers," "Plans," and "Benefit Plans" to access the Plaintiffs' services and discounted rates under the Agreements, on the condition that the BCBSA licensee accessing the Agreements, here Anthem GA, will be bound by the Agreements' terms.

128. Anthem GA did in fact access and rely upon the Agreements when Plaintiffs provided services to its Subscribers, and therefore, Anthem GA is bound by the terms of the Agreements as an "Affiliate," "Payor/Payer," "Plan," or "Benefit Plan" responsible for payment for the services at issue provided by Plaintiffs to the Subscribers.

129. Anthem GA's intent to be bound by the terms of the Agreements is also demonstrated by its conduct and the representations made by Anthem GA to its subscribers and to providers. Specifically, Anthem GA represents that the Hospitals are "in-network" with Anthem GA, and Anthem GA explains that in-network providers have a contract with Anthem GA. Anthem GA also authorized services for

certain of the claims at issue and issued a partial payment on at least one claim at issue.

130. Additionally, upon information and belief, the BlueCard program operates by all individual state licensees of the BCBSA entering into contracts with one another and/or with the BCBSA that allow licensees, such as Anthem GA, nationwide access to in-network reimbursement rates of other BCBS health plans, such as the Host Plans, for the licensees' members who receive medical services while living or traveling outside of the geographic boundaries of the Home Plan that issues the policy. Upon information and belief, each licensee must make its in-network rates available to all other BCBS-branded plans. The Host Plan charges the Home Plan an access fee for access to the local rates and an administrative fee for processing claims. In effect, these nationwide contracts provide a means by which individual licensees of the BCBSA, such as the Host Plans, assign their rights and locally negotiated payment rates under contracts with health care providers, such as Plaintiffs, to other licensees of the BCBSA, such as Anthem GA, thus allowing those licensees access to in-network rates, including the substantial discounts off of billed charges built into such rates, under those contracts. The assigning BCBSA licensees, which in this case are the Host Plans under the BlueCard Program, then act as the claims administrators and forward the claims to the Home Plan, which in this case is Anthem GA, for final determination and payment, for which the Home Plan is

obligated.

131. Plaintiffs contracted with the Host Plans, and, upon information and belief, the Host Plans contracted with Anthem GA (directly or indirectly through the BCBSA) to grant Anthem GA, as the Home Plan, access to the negotiated rates and terms between Plaintiffs and the Host Plans as set forth in the Agreements.

132. Under this arrangement, the BlueCard Program is essentially a rental network, and when there are multiple contracts between multiple parties in the rental network context, courts have construed the agreements as one contract between the multiple parties.

133. In this case, the Agreements between the Hospitals and the Host Plans and the agreements between the Host Plans and Anthem GA, whether direct or indirect through the BCBSA, should be construed as one contract, such that Anthem GA is bound by the terms of the Agreements between the Host Plans and the Hospitals.

134. Anthem GA knew that by participating in the BlueCard Program with the Host Plans that it would be bound by the terms of the Host Plans' contracts with its network providers, like the Hospitals, which is evidenced by the Agreements' express references to "Affiliates" and/or "Payors/Payers," "Plans," and/or "Benefit Plans" being bound by the terms of the Agreements.

135. Accordingly, there was a meeting of the minds between Plaintiffs and

Anthem GA as to the binding nature of the Agreements, as well as the material terms of the Agreements as they relate to both parties.

136. Under the Agreements, Plaintiffs are entitled to be paid specified rates for the provision of medically necessary, covered services to a subscriber.

137. Plaintiffs provided medically necessary, covered services to each of the Subscribers, and those services are payable under the terms of the Agreements.

138. Anthem GA breached the Agreements by failing to pay in full for the medically necessary, covered services Plaintiffs provided to the Subscribers described above.

139. Plaintiffs suffered damages as a direct and proximate result of Anthem GA's breach of the Agreements; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $501,213.64 under the Agreements for the medically necessary, covered services that Plaintiffs provided to Anthem GA's Subscribers.

**COUNT II – BREACH OF IMPLIED-IN-FACT CONTRACT**

140. The foregoing paragraphs are incorporated by reference, except to the extent they allege the existence, validity, or enforceability of an express contract, which allegations are pled solely in the alternative.

141. Alternatively, if Anthem GA is not bound to reimburse Plaintiffs by the terms of the Agreements as an as an "Affiliate," "Payor/Payer," "Plan," or "Benefit Plan" responsible for payment of the claims, Plaintiffs are entitled to be reimbursed

for the services provided to the Subscribers pursuant to an implied-in-fact contract existing between Plaintiffs and Anthem GA by reason of Anthem GA's participation in the BlueCard Program.

142. As participants in the BlueCard Program, Plaintiffs and Anthem GA impliedly agreed and understood that: (1) Plaintiffs would provide services to Anthem GA's subscribers, (2) Plaintiffs would submit claims to the Host Plans, Anthem GA's agents, for forwarding to Anthem GA for services provided to the subscribers, and (3) Anthem GA would reimburse Plaintiffs at the rates specified in Plaintiffs' Agreements with the Host Plans.

143. By participating in the BlueCard Program, Anthem GA, as an "Affiliate," "Payor/Payer," "Plan," or "Benefit Plan" was obligated to reimburse Plaintiffs at the rates set forth in the Agreements, even if Anthem GA was not a signatory to the Agreements.

144. Anthem GA's intent to be bound by an implied-in-fact contract with Plaintiffs is also evidenced by Anthem GA's conduct. Anthem GA participated in the adjudication of these claims, communicated with Plaintiffs regarding the claims, authorized the care to be provided for some of the claims, reviewed and adjudicated appeals, and issued partial payments.

145. Anthem GA's intent to be bound by an implied-in-fact contract with Plaintiffs is also demonstrated by the representations made by Anthem GA to its

subscribers and providers. Specifically, Anthem GA represents that the Hospitals are "in-network" with Anthem GA through the BlueCard Program, meaning it has a contract with Plaintiffs. Further, Anthem GA also represents in its Provider Manual that the Home Plan is responsible for adjudicating claims for services provided to subscribers based on the subscribers' benefits and the providers' agreement with the local BCBS plan. Upon information and belief, Anthem GA makes similar representations in its license agreement with the BCBSA.

146. Accordingly, there was a meeting of the minds between Plaintiffs and Anthem GA as to the binding nature of the implied-in-fact contract, as well as the material terms of the contract as they relate to both parties.

147. Anthem GA received consideration for the implied-in-fact contract because Plaintiffs provided medically necessary, covered services to the Subscribers; assisted Anthem GA in meeting its obligations to arrange for timely medical care to its Subscribers; Anthem GA accessed negotiated, discounted in-network rates for the services provided to its Subscribers; and Anthem GA received and retained premiums from the Subscribers in connection with the services provided.

148. Plaintiffs and Anthem GA understood Anthem GA to be bound to reimburse Plaintiffs according to the terms of the Agreements by reason of their participation in the BlueCard Program and by Anthem GA's own conduct and representations.

149. In reliance on the implied-in-fact contract formed between Plaintiffs and Anthem GA by reason of their participation in the BlueCard Program, Plaintiffs provided medical services to Anthem GA's Subscribers with the expectation that Anthem GA would reimburse Plaintiffs for such services according to the terms of the Agreements.

150. By denying claims for services provided by Plaintiffs to Anthem GA's Subscribers, Anthem GA breached the implied-in-fact contract existing between Plaintiffs and Anthem GA.

151. Plaintiffs have suffered damages as a direct and proximate result of Anthem GA's breach of the implied-in-fact contract; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $501,213.64 for the medically necessary, covered services Plaintiffs provided to Anthem GA's Subscribers.

## COUNT III – PROMISSORY ESTOPPEL

152. The foregoing paragraphs are incorporated by reference, except to the extent they allege the existence, validity, or enforceability of an express contract, which allegations are pled solely in the alternative.

153. Alternatively, even if Plaintiffs' breach of express or implied-in-fact contract claims fail, Plaintiffs are entitled to enforce Anthem GA's promises to reimburse them at the rates set forth in the Agreements pursuant to the doctrine of promissory estoppel.

154. Anthem GA knowingly participated in the BlueCard Program and, upon information and belief, promised in its license agreement to comply with the terms and conditions of the BlueCard Program, including its obligation to reimburse providers, like Plaintiffs, at the rates set forth in the providers' contracts with the Host Plan (here, Plaintiffs' Agreements with the Host Plans).

155. Additionally, Anthem GA knowingly accessed the Provider Agreement as an "Affiliate," "Payer," "Payor," and/or "Benefit Plan" by participating in the BlueCard Program, thereby promising to comply with the Agreements' terms and conditions, including their payment terms.

156. Anthem GA also agreed to comply with other provisions of the Agreements by accessing their terms and negotiated rates under the BlueCard Program, including the Agreements' provisions prohibiting Anthem GA from denying payment for authorized services. Anthem GA also represented the Plaintiffs as in-network providers having a contract with Anthem GA.

157. Plaintiffs reasonably relied on Anthem GA's promises to comply with the terms of the BlueCard Program and its representations that Plaintiffs are in-network, and in reliance on Anthem GA's promises, Plaintiffs provided medical services to Anthem GA's Subscribers and submitted claims for which it reasonably expected to be paid at the rates in the Agreements to Anthem GA.

158. Anthem GA also participated in the adjudication of these claims,

communicated with Plaintiffs regarding the claims, authorized the care to be provided for some of the claims, reviewed and adjudicated appeals, and issued partial payments.

159. Anthem GA failed to reimburse Plaintiffs as required by the terms of the BlueCard Program and the Agreements.

160. Additionally, as set forth above, with respect to some Subscribers, Anthem GA denied claims based on reasons expressly prohibited by the Agreements (such as improperly denying payment for authorized services), despite promising not to do so by reason of its assent to the Agreements and its terms and conditions.

161. It would be unjust to allow Anthem GA to represent to Plaintiffs through its various contractual promises that Plaintiffs would be paid at the rates set forth in the Agreements and that it would not deny claims for certain prohibited reasons, allow Plaintiffs to provide medically necessary, covered services to the Subscribers in reliance on those promises, and then permit Anthem GA to deny payment to Plaintiffs. It would also be unjust to allow Anthem GA to represent that Plaintiffs are in-network providers, meaning contractual providers, and then not pay the contract rates. Anthem GA should be estopped from doing so.

162. Plaintiffs have suffered damages as a direct and proximate result of Anthem GA's promises to reimburse Plaintiffs in accordance with the terms of the BlueCard Program and the Agreements; specifically, Plaintiffs are entitled to be

reimbursed in an amount not less than $501,213.64 for the medically necessary, covered services Plaintiffs provided to Anthem GA's Subscribers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant, enforce the terms of the Agreements or the implied-in-fact contract formed between Plaintiffs and Defendant, award to Plaintiffs the amount due under the Agreements, which totals $501,213.64, plus all additional recoverable damages, and grant any other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand that all claims and issues triable by jury be tried to a jury.

Respectfully submitted, this 5th day of October, 2026.

*/s/ Matthew S. Knoop*
Matthew S. Knoop
Georgia Bar No. 140870
mknoop@polsinelli.com
POLSINELLI PC
1201 West Peachtree Street, NW
Suite 1100
Atlanta, Georgia 30309
Telephone: (404) 253-6000
Facsimile: (404) 253-6060

**Counsel for Plaintiffs**

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1 (C), using 14-point Times New Roman font.

*/s/ Matthew S. Knoop*
Matthew S. Knoop
Georgia Bar No. 140870
**Counsel for Plaintiffs**